# UNITED STATES COURT OF APPEALS
# FOR THE TENTH CIRCUIT

RONALD D. RUSSO,
Plaintiff-Appellee-Cross-Appellant,

v.

BALLARD MEDICAL PRODUCTS,
Defendant-Appellant-Cross-Appellee.

On Appeal from the United States District Court
for the District of Utah
Honorable Tena Campbell, Presiding

## OPENING BRIEF OF DEFENDANT-APPELLANT
## BALLARD MEDICAL PRODUCTS

Michael B. Apfeld
GODFREY & KAHN, S.C.
780 North Water Street
Milwaukee, WI  53202
(414) 273-3500
mbapfeld@gklaw.com

Constantine L. Trela, Jr.
SIDLEY AUSTIN LLP
One South Dearborn
Chicago, IL  60603
(312) 853-7000
ctrela@sidley.com

Marcy G. Glenn
HOLLAND & HART, LLP
555 17th Street, Ste. 3200
Denver, CO  80202
(303) 295-8000
mglenn@hollandhart.com

*Attorneys for Defendant-Appellant-Cross-Appellee
Ballard Medical Products*

**ORAL ARGUMENT IS DESIRED**

**This brief has attachments in scanned pdf format.**

## RULE 26.1 CORPORATE DISCLOSURE STATEMENT

Appellant-Cross-Appellee Ballard Medical Products is a wholly-owned subsidiary of Kimberly-Clark Corporation, a publicly-traded corporation.  Kimberly-Clark Corporation was a named defendant in the district court, but is not a party to this appeal or cross-appeal; nevertheless, it has an interest (albeit indirect) in its outcome.

Also once named in the district court but no longer a party is Kimberly-Clark Worldwide, Inc., which is a wholly-owned subsidiary of Kimberly-Clark Corporation and does not have a financial interest in the outcome of this appeal or cross-appeal.

# TABLE OF CONTENTS

**Page**

JURISDICTIONAL STATEMENT ............................................. 1

I.    District Court Jurisdiction ........................................... 1

II.   Appellate Jurisdiction ................................................ 1

      A.    Timeliness ...................................................... 1

      B.    Choice of Circuit .............................................. 2

ISSUES PRESENTED FOR REVIEW ..................................... 5

STATEMENT OF THE CASE ................................................. 7

STATEMENT OF FACTS ......................................................10

I.    The Parties ..............................................................10

II.   The Improvements in Question....................................11

III.  The Essence of the Dispute ........................................13

IV.   The Parties' Conflicting Versions of
      Inventorship ............................................................14

      A.    Russo's Version ................................................15

      B.    Ballard's Version...............................................20

V.    The Absence of Corroboration ....................................24

VI.   Damages.................................................................31

SUMMARY OF ARGUMENT ...............................................35

ARGUMENT .....................................................................37

I.    THE VERDICT MAY NOT STAND IN THE
      ABSENCE OF FINDINGS AND PROOF THAT
      RUSSO SATISFIED PATENT LAW
      INVENTORSHIP STANDARDS. ...................................37

A.     Standard of Review/Preservation of Error.............37

B.     A State Law Claim Whose Elements Are Factually Inconsistent with a Patentee's Presumption of Inventorship Cannot Be Maintained Unless the Plaintiff Satisfies Federal Patent Law Standards for Overcoming That Presumption. ...........................39

C.     Russo's Claims are Diametrically Inconsistent with the Presumption of Inventorship Arising from Ballard's Patents. ...............................................................45

D.     Patent Law Requires Reversal or, at the Very Least, a New Trial. ......................................47

II.    THE DAMAGES AWARDED WERE EITHER UNAVAILABLE AS A MATTER OF LAW, EXCESSIVE, OR BOTH. ...............................................51

A.     Standard of Review/Preservation of Error.............51

B.     The Award Invaded the Realm of Patent Law Not Only by Compensating Russo for the Value of The Invention *Per Se*, But Also by Using a Greater Measure of Damages Than That Allowed by Patent Law. ...............................................................53

C.     The Remedy of Unjust Enrichment Should Not Have Been Available to Russo Under These Facts. ...............................................57

1.    The Utah Trade Secrets Act prohibits an award of both Ballard's profits and a royalty.....................................58

ii

2.    Unjust enrichment is not an appropriate measure of damages where, as here, the plaintiff intended to license his (alleged) invention to the defendant. ..........................58

3.    Nor is unjust enrichment available where, as here, the plaintiff fails to limit his claim to profits attributable to his idea....................................................62

D.    Even Assuming That Unjust Enrichment Was Available, Under No Circumstances Was Russo Entitled to Recover Ballard's Profits for the Duration of Ballard's Patents. ............................................................65

1.    The Confidential Disclosure Agreement ........66

2.    Actual or constructive disclosure .................68

3.    The "head start" rule....................................68

E.    In Any Event, the Award of Unjust Enrichment Was Both Speculative and Overbroad..........................................................71

F.    Although a Reasonable Royalty Would Have Been an Appropriate Remedy, Russo Did Not Establish a Competent Basis for One. ....................................................73

CONCLUSION .....................................................................76

CERTIFICATE OF COMPLIANCE WITH RULE 32(a)(7)(B) .....................................................................76

STATEMENT CONCERNING ORAL ARGUMENT....................76

CERTIFICATE OF SERVICE ...................................................78

# ADDENDUM

**Tab**

**Judgment, Verdict, Orders, and Decisions**

Judgment ........................................................................1

Special Verdict Form ......................................................2

Order and Memorandum Decision
(March 7, 2007) ..........................................................3

Order regarding November 1, 2006 hearing .......................4

Order and Memorandum Decision
(August 10, 2006) .......................................................5

**Statutes**

Utah Trade Secrets Act ...................................................6

**Exhibits**

Exhibit 1—March 27, 1998 Confidential
Disclosure Agreement ..................................................7

Exhibit 39 (excerpts)—Drawing of Tracheal
Suction Catheter in Use on Patient................................8

Exhibit 36 (excerpts)—Three Diagrams from
the '451 Patent Showing Flapper Valve and
Second Wiper Seal ......................................................9

Exhibit 2A (excerpt)—Page from Russo Logbook
Showing Entries for RD 478 through RD 482 ..............10

Exhibit 9A—RD 478 ......................................................11

Exhibit 20—Drawing No. 4 .............................................12

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Abbott Labs. v. Brennan,*
  952 F.2d 1346 (Fed. Cir. 1991)...........................................43

*Air Prods. & Chems., Inc. v. Reichhold Chems., Inc.,*
  755 F.2d 1559 (Fed. Cir. 1985)........................................ 2

*Alcatel USA, Inc. v. Cisco Sys.,*
  239 F. Supp. 2d 660 (E.D. Tex. 2002)..........................62, 64

*Armstrong v. Comm'r,*
  15 F.3d 970 (10th Cir. 1994) ..............................................51

*AT&T Co. v. Integrated Network Corp.,*
  972 F.2d 1321 (Fed. Cir. 1992)........................................ 4

*Atlantic Richfield Co. v. Farm Credit Bank,*
  226 F.3d 1138 (10th Cir. 2000) ........................................72

*Bender v. Williamsport Area School District,*
  475 U.S. 534 (1986) ...................................................... 4

*Bonito Boats, Inc. v. Thunder Craft Boats, Inc.,*
  489 U.S. 141 (1989) ............................................40, 53, 56

*Boyle v. United Techs. Corp.,*
  487 U.S. 500 (1988) ......................................................47

*C&F Packing Co. v. IBP, Inc.,*
  224 F.3d 1296 (Fed. Cir. 2000)..................................44, 45

*Celeritas Techs., Ltd. v. Rockwell Int'l Corp.,*
  150 F.3d 1354 (Fed. Cir. 1998).........................................60

*Champagne Metals v. Ken-Mac Metals, Inc.,*
  458 F.3d 1073 (10th Cir. 2006) .........................................51

*Christianson v. Colt Indus. Operating Corp.*,
   486 U.S. 800 (1988) ......................................................3, 4, 5

*Coleman v. B-G Maint. Mgmt. of Colo., Inc.*,
   108 F.3d 1199 (10th Cir. 1997) ...........................................47

*Compco Corp. v. Day-Brite Lighting, Inc.*,
   376 U.S. 234 (1964) .........................................................39

*Design Innovation, Inc. v. Fisher-Price, Inc.*,
   463 F. Supp. 2d 177 (D. Conn. 2006) ...........................59, 60

*Dow Chem. Co. v. Exxon Corp.*,
   139 F.3d 1470 (Fed. Cir. 1998)....................................43, 44

*E. L. Bruce Co. v. Bradley Lumber Co.*,
   79 F. Supp. 176 (W.D. Ark. 1948)......................................61

*Eli Lilly & Co. v. Aradigm Corp.*,
   376 F.3d 1352 (Fed. Cir. 2004)..........................................40

*FDIC v. Hamilton*,
   122 F.3d 854 (10th Cir. 1997) ............................................51

*Fitzgerald v. Mountain States Tel. & Tel. Co.*,
   68 F.3d 1257 (10th Cir. 1995) .............................................52

*Ford v. American Express Fin. Advisors, Inc.*,
   98 P.3d 15 (Utah 2004) .....................................................61

*Gambro Lundia AB v. Baxter
   HealthCare Corp.*,
   110 F.3d 1573 (Fed. Cir. 1997)....................................40, 41

*Gasoline Prods. Co. v. Champlin Ref. Co.*,
   283 U.S. 494 (1931) .........................................................51

*Gemstar-TV Guide Int'l, Inc. v. Int'l Trade
   Comm'n*,
   383 F.3d 1352 (Fed. Cir. 2004)....................................40, 46

*Goldberg v. Medtronic, Inc.*,
686 F.2d 1219 (7th Cir. 1982) .............................................63

*Hahn v. Wong*,
892 F.2d 1028 (Fed. Cir. 1989).............................................50

*Hunter Douglas, Inc. v. Harmonic Design, Inc.*,
153 F.3d 1318 (Fed. Cir. 1998),
*overruled in part on other grounds by*
*Midwest Indus., Inc. v. Karavan Trailers,*
*Inc.*,
175 F.3d 1356 (Fed. Cir. 1999)...........................3, 43, 44, 54

*K-B Trucking v. Riss Int'l Corp.*,
763 F.2d 1148 (10th Cir. 1985) .........................................52

*Kewanee Oil Co. v. Bicron Corp.*,
416 U.S. 470 (1974) ...........................................................39

*Kilpatrick v. Wiley, Rein & Fielding*,
37 P.3d 1130 (Utah 2001) ..................................................61

*KW Plastics v. U.S. Can Co.*,
131 F. Supp. 2d 1289 (M.D. Ala. 2001).........................62, 64

*Laurie Visual Etudes, Inc. v.*
*Chesebrough-Pond's, Inc.*,
432 N.Y.S.2d 457 (N.Y. Sup. Ct. 1980)
*rev'd on liability*, 441 N.Y.S.2d 88
(Sup. Ct. App. Div. 1981)..............................................61, 63

*Learning Curve Toys, Inc. v. PlayWood Toys,*
*Inc.*,
342 F.3d 714 (7th Cir. 2003) .............................................60

*Mason v. Texaco, Inc.*,
948 F.2d 1546 (10th Cir. 1991) .........................................38

*Medichem, S.A. v. Rolabo, S.L.*,
437 F.3d 1157 (Fed. Cir. 2006)......................................49, 50

*MedSpring Group, Inc. v. Feng,*
  368 F. Supp. 2d 1270 (D. Utah 2005) .................................67

*Menne v. Celotex Corp.,*
  861 F.2d 1453 (10th Cir. 1988) ..........................................38

*Mid-Michigan Computer Sys., Inc. v. Marc
  Glassman, Inc.,*
  416 F.3d 505 (6th Cir. 2005) .......................................59, 60

*Morrison Knudsen Corp. v. Fireman's Fund
  Ins. Co.,*
  175 F.3d 1221 (10th Cir. 1999) ..........................................52

*Nobelpharma AB v. Implant Innovations, Inc.,*
  141 F.3d 1059 (Fed. Cir. 1998)..........................................43

*Norris v. Baxter Healthcare Corp.,*
  397 F.3d 878 (10th Cir. 2005) ...........................................72

*Olson v. Nieman's, Ltd.,*
  579 N.W.2d 299 (Iowa 1998) ...........................................63

*Price v. Symsek,*
  988 F.2d 1187 (Fed. Cir. 1993)....................................41, 49

*Reese v. Hurst,*
  661 F.2d 1222 (C.C.P.A. 1981) .........................................50

*Roboserve, Ltd. v. Tom's Foods, Inc.,*
  940 F.2d 1441 (11th Cir. 1991) .........................................56

*Saco-Lowell Shops v. Reynolds,*
  141 F.2d 587 (4th Cir. 1944) ............................................59

*Schiller & Schmidt, Inc. v. Nordisco Corp.,*
  969 F.2d 410 (7th Cir. 1992) ......................................62, 64

*Schreyer v. Casco Prods. Corp.,*
  190 F.2d 921 (2d Cir. 1951) .............................................56

*Sears, Roebuck & Co. v. Stiffel Co.,*
376 U.S. 225 (1964) ...........................................................39

*Softel, Inc. v. Dragon Med. & Scientific*
*Commc'ns, Inc.,*
891 F. Supp. 935 (S.D.N.Y. 1995)......................................63

*Sokol Crystal Prods., Inc. v. DSC Commc'ns*
*Corp.,*
15 F.3d 1427 (7th Cir. 1994) .............................................69

*Soules v. Indep. Sch. Dist.,*
258 N.W.2d 103 (Minn. 1977)............................................61

*Stern v. Trs. of Columbia Univ.,*
434 F.3d 1375 (Fed. Cir.), *cert. denied,*
___ U.S. ___, 127 S. Ct. 83 (2006) ....................42, 44, 47, 50

*Stevison by Collins v. Enid Health Sys., Inc.,*
920 F.2d 710 (10th Cir. 1990) ...............................38, 47, 51

*Telex Corp. v. IBM Corp.,*
510 F.2d 894 (10th Cir. 1975) ...........................................69

*Thompson v. Shelter Mut. Ins.,*
875 F.2d 1460 (10th Cir. 1989) .........................................52

*Townsend v. Lumbermens Mut. Cas. Co.,*
294 F.3d 1232 (10th Cir. 2002) ...................................38, 51

*U.S. Valves, Inc. v. Dray,*
212 F.3d 1368 (Fed. Cir. 2000),....................................3, 43

*Ultra-Precision Mfg., Ltd. v. Ford Motor Co.,*
411 F.3d 1369 (Fed. Cir. 2005)....................................54, 56

*Univ. Computing Co. v. Lykes-Youngstown*
*Corp.,*
504 F.2d 518 (5th Cir. 1974) ..................................63, 73, 74

*Univ. of Colo. Found., Inc. v. American Cyanamid Co.*,
196 F.3d 1366 (Fed. Cir. 1999)...................................passim

*Univ. of Colo. Found., Inc. v. American Cyanamid Co.*,
342 F.3d 1298 (Fed. Cir. 2003)........................................54

*Uroplasty, Inc. v. Advanced Uroscience, Inc.*,
239 F.3d 1277 (Fed. Cir. 2001)........................................45

*Vermont Microsystems, Inc. v. Autodesk, Inc.*,
88 F.3d 142 (2d Cir. 1996) ........................................74, 75

*Vitro Corp. v. Hall Chem. Co.*,
292 F.2d 678 (6th Cir. 1961) ..........................................61

*Wankier v. Crown Equip. Corp.*,
353 F.3d 862 (10th Cir. 2003) .........................................38

**Statutes**

28 U.S.C. § 1291.................................................... 1

28 U.S.C. § 1295..................................................2, 4

28 U.S.C. § 1332.................................................... 1

28 U.S.C. § 1338..................................................2, 4

28 U.S.C. § 1441.................................................... 1

28 U.S.C. § 1631.................................................... 5

35 U.S.C. §§ 101-103.................................................40

35 U.S.C. § 282 ....................................................40

35 U.S.C. § 284 ....................................................57

UTAH CODE ANN. § 13-24-2(4)(a) ....................................55, 65

UTAH CODE ANN. § 13-24-3(1) .........................................65

x

Utah Code Ann. § 13-24-3(2) ................................................65

Utah Code Ann. § 13-24-4(1) .........................................58, 62

**Treatises and Articles**

Blair, Roger D. & Cotter, Thomas F.,
*An Economic Analysis of Damages Rules
in Intellectual Property Law,*
39 Wm. & Mary L. Rev. 1585 (1998) ...................................57

Johnson, Craig N., *Assessing Damages for
Misappropriation of Trade Secrets,*
Colo. Law., Aug. 27, 1998 ................................................63

Perillo, Joseph M.,
Corbin on Contracts
§ 55.3 (rev'd ed. 2005) ......................................................61

Restatement (Third) of
Unfair Competition § 44 (1995)..........................................68

Restatement (Third) of
Unfair Competition § 45 (1995)....................................63, 69

Schlicher, John W.,
Patent Law: Legal and Economic
Principles § 9.04[2][6] (2001) .............................................57

Smith, Douglas G., *Application of Patent Law
Damages Analysis to Trade Secret
Misappropriation Claims: Apportionment,
Alternatives, and Other Common
Limitations on Damages,*
25 Seattle U. L. Rev. 821 (2001-02) ...................................56

**Other Authorities**

ABA Model Jury Instructions:
Business Torts Litigation,
Instruction 8.6.4 ..............................................................69

Fed. R. App. P. 4(a)(1)(A) ................................................... 2

MANUAL OF PATENT EXAMINING PROCEDURES
  § 1706 ...............................................................................25

UNIFORM TRADE SECRETS ACT,
  14 U.L.A. 589 (2005 main volume)................... 56, 65, 68, 69

**THERE ARE NO PRIOR OR RELATED APPEALS**

# JURISDICTIONAL STATEMENT

## I.     District Court Jurisdiction

This action was originally filed in Rhode Island Superior Court.  Defendants removed the action under 28 U.S.C. § 1441, invoking diversity jurisdiction under 28 U.S.C. § 1332.  The plaintiff, Ronald Russo, was a citizen of Rhode Island.  Defendant Ballard Medical Products ("Ballard") was a Utah corporation with its principal place of business in Utah.  Defendants Kimberly-Clark Worldwide, Inc. and Kimberly-Clark Corporation (named at the time but not parties to this appeal) were Delaware corporations with their principal places of business in Texas.  The amount in controversy exceeded $75,000.00, exclusive of interest and costs.

## II.    Appellate Jurisdiction

### A.    Timeliness

Appellate jurisdiction is based on 28 U.S.C. § 1291.  Final judgment disposing of all parties' claims was entered in the District Court for the District of Utah (to which the case had been transferred) on March 19, 2007, and Ballard timely

filed its notice of appeal on April 10, 2007.  FED. R. APP. P. 4(a)(1)(A).

## B.    Choice of Circuit

Ballard believes that an appeal lies to this Court, but the nature of Russo's claims could support exclusive jurisdiction in the Federal Circuit.

Under 28 U.S.C. § 1295, the Federal Circuit has exclusive appellate jurisdiction over appeals in cases in which the district court's jurisdiction rested, in whole or in part, on 28 U.S.C. § 1338.  That section provides for district court jurisdiction over actions "arising under," *inter alia*, "any Act of Congress relating to patents."

Whether jurisdiction exists under section 1338 and, thus, under section 1295 is determined based on the allegations of the complaint as filed.  *See Air Prods. & Chems., Inc. v. Reichhold Chems., Inc.*, 755 F.2d 1559, 1562 (Fed. Cir. 1985).  A state law claim arises under federal patent law for purposes of jurisdiction under section 1338 where the plaintiff's right to relief necessarily depends upon resolution of a substantial question of federal patent law.  *See Christianson*

*v. Colt Indus. Operating Corp.,* 486 U.S. 800, 808-09 (1988);

*Hunter Douglas, Inc. v. Harmonic Design, Inc.*, 153 F.3d 1318,

1324-25 (Fed. Cir. 1998), *overruled in part on other grounds by*

*Midwest Indus., Inc. v. Karavan Trailers, Inc.*, 175 F.3d 1356,

1361 (Fed. Cir. 1999).

Pursuant to this principle, the Federal Circuit has held

that state law claims arise under federal patent law for

jurisdictional purposes where the plaintiffs could not prevail

on those claims without proving facts that were incompatible

with the validity of a patent.  *See, e.g., Univ. of Colo. Found.,*

*Inc. v. American Cyanamid Co.*, 196 F.3d 1366, 1372 (Fed. Cir.

1999); *Hunter Douglas, Inc.*, 153 F.3d at 1324-25; *U.S. Valves,*

*Inc. v. Dray*, 212 F.3d 1368, 1372 (Fed. Cir. 2000), all

discussed in greater detail at 39-45, below.

Russo's complaints asserted state law claims for

misappropriation of trade secrets.  All three complaints alleged

that Ballard misappropriated the secrets and then obtained its

own U.S. patents covering them.  All three complaints thus

hinge on Russo's claim that he is the true inventor of

inventions protected by patents issued to Ballard.  The case

was tried on this theory, and Russo prevailed. Thus, Russo's claim, as pleaded and proved, depended on at least one proposition (his alleged inventorship of patented subject matter) that is incompatible with the validity of Ballard's patents. *See infra* at 45-47.

This, however, is not necessarily dispositive. Where the complaint as pleaded can be read to allege at least one theory that does not necessarily involve patent law, section 1338 jurisdiction (and thus section 1295 jurisdiction) does not exist, even if, as the case later unfolds, patent law issues emerge as the focus of the litigation. *See Christianson*, 486 U.S. at 810; *AT&T Co. v. Integrated Network Corp.*, 972 F.2d 1321, 1324 (Fed. Cir. 1992). Ballard believes that Russo's complaints can be read to allege a trade secret theory that did not depend on patent law, even though he did not pursue that theory at trial. In this situation, jurisdiction under sections 1338 and 1295 does not exist, making this Court the proper appellate forum.

However, because this Court has a "special obligation" to satisfy itself of its own jurisdiction, *Bender v. Williamsport Area School District*, 475 U.S. 534, 541 (1986), Ballard submits that

this Court should, in the first instance, determine whether jurisdiction here is proper. If not, this Court should transfer this appeal to the Federal Circuit under 28 U.S.C. § 1631. *See, e.g., Christianson*, 486 U.S. at 819. Otherwise, this Court should proceed to the merits.

## ISSUES PRESENTED FOR REVIEW

This is an action for misappropriation of trade secrets and breach of a Confidential Disclosure Agreement ("CDA"). Plaintiff Ronald Russo claims that he invented certain improvements to Defendant Ballard's existing (and already patent-laden) closed suction tracheal catheter and that Ballard, in violation of the CDA, stole and used his invention to obtain patents on those improvements. Two principal issues are presented:

1. Should Russo's state law claims, which are factually irreconcilable with the presumption of inventorship arising from Ballard's patents, have been subject to federal standards for challenging that presumption, which explicitly require clear and convincing evidence and independent corroboration?

2. Was the damage award excessive? This issue entails several subsidiary questions:

a. Does patent law allow Russo to recover, for alleged misappropriation of a "secret" invention on which he does not hold a patent, damages to compensate for the value of his invention *per se* and, indeed, greater damages than he could recover if he held a patent?

b. Should Russo have been allowed to recover unjust enrichment (*i.e.,* Ballard's profits from sales of the device allegedly incorporating his secret) where (i) he also was awarded a royalty for Ballard's use of that same secret; (ii) he was willing to license the alleged secret to Ballard; and (iii) he failed to prove what part of Ballard's profits was attributable to his alleged secret?

c. Assuming unjust enrichment is available, may Russo recover Ballard's profits for the duration of Ballard's patents or, instead, only for the life of his secret?

d. Whatever the appropriate damages period, was Russo's calculation of Ballard's profits excessive where it

included profits not attributable to Russo's invention and failed to allow for the "cannibalization" effect of the accused product on Ballard's sales of other products?

e. May royalty damages for trade secret misappropriation be based solely on the price Russo demanded, prior to suit, to license a cluster of inventions, in the absence of any showing that the price demanded was an objectively reasonable royalty for the particular trade secret at issue?

## STATEMENT OF THE CASE

Plaintiff filed this action in Rhode Island Superior Court on November 12, 2003. Appellant's Appendix ("Aplt.App.") 47. Defendants removed the action, and the United States District Court for the District of Rhode Island subsequently transferred the case to the District of Utah. *Id.* 47, 49, 73-86.

Although Russo amended his complaint twice, all three pleadings were based upon the same alleged wrongdoing: Russo claims that he disclosed to Ballard representatives certain specific improvements to Ballard's closed tracheal suction system. Each complaint alleges that Ballard declined

to license the disclosed technology from Russo.  And each alleges that Ballard then obtained patents on those improvements and used them in its commercial products.  *See* Aplt.App. 50-60 (original Complaint), 61-72 (First Amended Complaint), 87-101 (Second Amended Complaint).

As the matter advanced toward trial, Ballard moved for summary judgment, arguing that Russo could not satisfy federal standards for overcoming the presumption of inventorship to which Ballard was entitled by reason of its patents.  *Id.* 110-160, 263-275.  The district court denied the motion, holding that federal inventorship standards did not apply, *id.* 299-303, also found at Addendum Tab 5 at 18-22 (hereinafter "Tab __ at __"), and eventually instructing the jury, over Ballard's repeated objections, *e.g.*, Aplt.App. 336, 373, 394-95, 497, 2101, on the ordinary standard of proof.  *Id.* 536, 541, 549.

Ballard also filed motions directed at limiting Russo's damages.  Among other things, Ballard argued that Russo included in his calculation of damages the value of inventions Ballard was not even accused of taking, that he had no

evidence of what a reasonable royalty would be, that he was not entitled to recover unjust enrichment damages, and that his damages must be limited to the two-year term of the CDA. Aplt.App. 225-35, 276-81, 338-60, 472-82. The trial court denied all of Ballard's motions. It did, however, preclude Russo's expert from addressing whether the rate upon which he based his royalty calculations was reasonable, because Russo had stated that the report was "nothing more than a pure mathematical calculation" that "does not purport to designate a reasonable royalty rate" and because Russo had "indicated he will establish the propriety of the royalty rate through the introduction of other evidence." *Id.* 312-13 (Tab 5 at 31-32); *id.* 484-85 (Tab 4 at 1-2). Ballard then requested jury instructions allowing the jury to account for these factors and objecting to those instructions that did not. *Id.* 328, 381-85, 394, 405-09, 491, 494-95, 506-08, 2111-13. These Ballard positions were rejected. *Id.* 547-52, 2112.

Trial began on November 6, 2006. *Id.* 1090, *et seq.* By agreement of the parties, only two of Russo's four claims were submitted to the jury: misappropriation of trade secrets and

breach of the CDA. Aplt.App. 2102-10. On November 13, 2006, the jury returned a verdict finding for Russo on both claims and awarding $17 million in unjust enrichment and $3 million in contract damages. *Id.* 558-60 (Tab 2).

The trial court deferred entry of judgment pending disposition of post-verdict motions. Ballard moved for judgment as a matter of law, a new trial, and remittitur. *Id.* 561-615, 636-658. Russo moved for prejudgment interest, attorneys' fees, and punitive damages. *Id.* 40-41 (Dkt. Nos. 352, 354, 364). On March 7, 2007, the district court denied all post-verdict motions, *id.* 660-71 (Tab 3), and judgment was entered on March 19, 2007. *Id.* 672 (Tab 1). On April 10, Ballard filed a notice of appeal. *Id.* 673-74. Russo subsequently filed a cross-appeal, limited to the district court's denial of his motion for post-verdict prejudgment interest. *Id.* 675A-C.

## STATEMENT OF FACTS

### I. The Parties

Russo is an inventor of medical devices. Aplt.App. 1143. Although Russo has invented stand-alone products, he

devotes substantial attention to devising improvements to products developed by others.  *Id.* 1144-57.  He does not manufacture any of his inventions and does not have the capability to do so.  *Id.* 1229.

Ballard is a medical technology company that offers a range of specialized medical devices.  Its flagship product is a closed system tracheal catheter known as "Trach Care."  This lawsuit arises out of certain improvements to Trach Care that are disclosed and claimed in U.S. Patents Nos. 6,227,200 and 6,543,451 issued to Ballard (the '200 and '451 patents, respectively).  Aplt.App. 2845-79 (Ex. 35), 2880-911 (Ex. 36).

## II.  The Improvements in Question

Ballard's Trach Care is a "closed" endotracheal suction catheter system that enables patients on ventilators with endotracheal tubes to have their airways cleaned of mucus by suctioning while maintaining ventilator support.

Prior to Trach Care, respiratory therapists used an "open" process of suctioning patients' airways.  In an open process, therapists disconnect the patient from the ventilator, insert a single-use suction catheter into the patient's airway, suction

the patient, remove the catheter, and reattach the patient to the ventilator. This system not only deprives the patient of new air while the ventilator is disconnected, but increases the possibility of infection. By contrast, the "closed" Trach Care suctioning catheter can be attached to the ventilator circuit and remain in place while the patient is suctioned several times over a 24-hour period. Aplt.App. 1622, 2151, 1172.[1] The original Trach Care was not approved for use beyond 24 hours, although many practitioners used it "off label" for longer than the approved period. *Id.* 1658-59, 1662-63.

The Trach Care 24 product was covered by approximately 27 patents before the events giving rise to this lawsuit. *Id.* 1450, 2156, 4647-51. Russo's claim does not implicate any of these patents. Instead, Russo's lawsuit involves two improvements to the product: (1) a vented valve (a "duckbill" valve in Russo's embodiment and a "flapper" valve in Ballard's); and (2) a second wiper or "PEEP" seal (in addition to

---

[1] A drawing showing a patient being suctioned with a closed system catheter may be found at Aplt.App. 2913 (Tab 8).

one already incorporated into the existing product).[2]  These improvements, upon which Ballard obtained patents, allowed the catheter to be cleaned more effectively after each suctioning, ultimately leading to FDA approval for 72-hour use of the product (thereby converting the "Trach Care" product to the "Trach Care 72").

A sequence of diagrams from Ballard's '451 patent may be found at Tab 9.  These show in schematic form the placement of the flapper valve and second seal in the overall device.[3]

## III.  The Essence of the Dispute

On April 30, 1998, Russo (who had had prior dealings with Ballard) met with two Ballard employees over lunch in New York City to discuss certain inventions Russo had developed which might be of interest to Ballard.  There is no

---

[2] A "PEEP" seal is designed to maintain "Positive End Expiratory Pressure, which keeps the lungs partially inflated." Aplt.App. 1374.

[3] The first diagram at Tab 9, figure 6A, is an exploded view. The second and third diagrams, figures 6B and 6C, show the device with the catheter in the retracted and extended positions, respectively.  In all three diagrams, the flapper valve is 1232 (the vent hole of which is 1260), the "second" or "wiper" seal is 1280, and the original PEEP seal is 1286.

dispute that the meeting took place. There is no dispute that Russo and Ballard executed the CDA before the meeting, that the CDA specifically described three Russo inventions that were to be discussed, and that the CDA's description of those inventions does not include either a vented duckbill valve or a second wiper seal (the inventions at issue here). There is no dispute that Russo gave Ballard materials relating directly to the three inventions specified in the CDA and that those materials did not include a vented duckbill valve or second wiper seal, either. And there is no dispute that Ballard never used the three inventions described in the CDA.

What *is* in dispute is whether Russo disclosed the vented duckbill valve and second wiper seal *at the New York meeting*. Russo claims he did, and that Ballard improperly took that idea and obtained patents on it. Ballard denies that, and claims it developed the patented inventions on its own.

## IV. The Parties' Conflicting Versions of Inventorship

As discussed below at 37-51, Ballard contends that the district court erred by failing to instruct the jury on, and otherwise to apply, the correct standard of proof. For this

14

reason, and because the two versions of inventorship presented at trial are not only radically inconsistent but are essentially independent of one another, they will be treated separately.

## A. Russo's Version

According to Russo, in late 1996 or early 1997 he received separate phone calls from Rick Lorenzen, Ballard's director of product development, and Ed Madsen, a Ballard project engineer, asking for Russo's help extending the useful life of the Trach Care product. Aplt.App. 1163, 1174-75. Russo testified that he told each that he had already filed a patent application that was "moving in that direction" and was working on other potential improvements to Ballard's product. *Id.* 1164, 1187-88, 2635-36 (Ex. 7). Lorenzen sent Russo a half dozen Trach Care units to assist him in his work. *Id.* 1164-65, 3071-73.

According to Russo, by March 17, 1997, he had produced a drawing, "RD 478," which embodies the inventions involved in this lawsuit. Aplt.App. 1187-88, 2637 (Tab 11). At or about

the same time, says Russo, he produced a prototype that had all the features of his invention.  *Id.* 1192-93.

Nearly a year had elapsed without Russo disclosing his alleged breakthrough to Ballard, when Russo received another call from Lorenzen.  *Id.* 1418.  Russo says he told Lorenzen that he thought he had something for him; Lorenzen promised to get back to him with a confidentiality agreement.  *Id.* 1197. Ballard sent Russo the CDA which incorporated Russo's description of the covered technology, *id.* 1198, 2641-43 (Ex. 12), and Russo executed and returned it on March 27, 1998.  *Id.* 1198-99, 2645-48 (Ex. 14).  As with other confidentiality agreements Russo had executed with Ballard in the past to cover other disclosures, *e.g.*, *id.* 1326, 4571-73, the CDA provided that Ballard would maintain the confidentiality of the information Russo disclosed, that this obligation (among others) would expire two years from the CDA's date, and that, if Ballard and Russo did not agree to a separate license, Ballard would have no obligation to pay royalties or other consideration for that information.  *Id.* 2557-58 (Tab 7).

After executing the CDA, Russo sent Ballard a binder of materials relating to three issued or pending patents, *i.e.*, those inventions specified in the CDA.  Aplt.App. 1200-01.  None of these contains the trade secrets involved in this action.  *Id.* 1353-55, 1439.  Russo admits that he did not send Ballard either RD 478 or his prototype.  *Ibid.*

Lorenzen, who was traveling to New York City on other business, suggested that he and another Ballard employee, Chris Thomas, get together with Russo.  *Id.* 1202-03.  On April 30, 1998, Russo, Lorenzen, and Thomas met for lunch.  *Id.* 1204.

Russo testified he brought four additional drawings to the lunch.  *Ibid.*; *id.* 2783-85 (Ex. 19), 2786 (Ex. 20) (Tab 12).  The first three, contained in Exhibit 19, related to the existing patent and patent applications included in the binder he had sent to Ballard (and did not, as noted above, contain any trade secret alleged to have been taken by Ballard).  Aplt.App. 1205-07, 1353-55, 1439.  The fourth drawing, Exhibit 20 (Tab 12), referred to at trial as "Drawing No. 4," was a "re-drawing" of RD 478.  *Id.* 1208.  Russo testified that he gave

copies of all four drawings to Thomas and Lorenzen, *id.* 1209, and described a discussion in which Lorenzen "took copious notes" and "asked a million questions." *Id.* 1210-11. Russo also testified that he displayed the prototype and demonstrated how it could be used. *Id.* 1213.

According to Russo, Lorenzen asked how much Russo wanted for everything Russo had presented. *Id.* 1215. Russo responded that he wanted $50,000 up front and a 5% royalty on net sales of products incorporating the technology with a guaranteed minimum of $50,000 per year. *Ibid.* According to Russo, Lorenzen responded that it "seemed like very reasonable and fair" and said he would take the material back to Ballard. *Id.* 1216. Russo kept the prototype and one set of all drawings and gave the others to Lorenzen and Thomas. *Ibid.*

Russo and Ballard thereafter exchanged drafts of an option agreement. *Id.* 1216-19, 2789-806 (Ex. 24), 2807 (Ex. 26), 2809 (Ex. 28), 2810-20 (Ex. 29), 2821-24 (Ex. 30), 2825-37 (Ex. 31), 2838-40 (Ex. 32). All draft agreements and other communications assumed that Ballard would acquire

"everything lock, stock and barrel," *i.e.*, all technology disclosed. Aplt.App. 1222. (As explained in more detail below at 30-31, however, none of the drafts mentioned the alleged trade secret at issue here.) As discussions progressed, Russo decreased his financial demand, offering to convey all of the technology for a 3% royalty with a $50,000 minimum annual guarantee. *Id.* 2838-40 (Ex. 32). The parties failed to reach agreement, however, and negotiations ended in September 1998. *Id.* 1223-24.

Russo did not attempt to sell his ideas to anyone else; he says it was in part because Ballard was the largest manufacturer in the world and in part because he "felt that sooner or later they would come back to me." *Id.* 1227-28. Nor did he try to patent his ideas. *Id.* 1228.

Russo says he first suspected that Ballard had taken his ideas when one of his prior patents was cited as a reference in the '200 patent, issued to Madsen and two other Ballard employees, Chet Crump and Roland Smith, in May 2001. *Id.* 1229. His suspicions were confirmed when a second patent, the '451 patent, issued to Madsen and Crump, showing (Russo

testified) "all the technology and materials in my Drawing Number Four and in my prototype." *Id.* 1230.  Russo subsequently learned that Ballard had commercialized these ideas in a product, the Trach Care 72.  *Id.* 1232-33.

According to Russo, the '451 patent, which issued in May 2003, contains all of the inventive ideas in his RD 478 drawing, with the exception of the substitution of a flap valve for Russo's duckbill valve; other than that, "it is exactly the same." *Id.* 1230-32.  Like the '451 patent, Russo testified, the Trach Care 72 product "has each and every element functioning in the same exact manner, clinically operated in the same manner, manufactured in the same manner" as his invention.  *Id.* 1233.  Russo did not, however, take any action to challenge Ballard's two patents.

### B.    Ballard's Version

The two Ballard employees at the April 30, 1998 meeting testified that Russo did not show them anything like Drawing No. 4 or his prototype, nor anything else with either a second seal or a duckbill or flapper valve intended to extend the life of the product.  *See generally* Aplt.App. 1370-75, 1377-79, 1385

(Thomas); *id.* 2186-88 (Lorenzen).[4]  Moreover, Ballard's inventors, Crump and Madsen, denied having received any information from Russo, through Lorenzen, Thomas, or otherwise, *see, e.g.*, *id.* 1755-56, 1759; 1878 (Crump); *id.* 1880-81, 1935-36, 1975 (Madsen).  Instead, Ballard's witnesses described a very different course of invention, extending over a much longer period and evolving in stages.

Because Trach Care was its flagship product, Ballard was constantly investigating possible changes to improve it.  *Id.* 1884, *et seq.*  In particular, Ballard wanted to find a way to reduce the volume of gases taken from the ventilator circuit during the rinsing and cleaning process.  *Id.* 1905-06, 1911. The concern was prompted by tests of a competitor's suction catheter, which was better able to retain pressure within the

---

[4] Russo introduced an excerpt from Thomas's deposition in which he appeared to acknowledge having seen Drawing No. 4 at the New York meeting, *see* Aplt.App. 1387, 2472-76. However, Thomas (whose bailiwick was marketing and sales, not engineering, *see id.* 1381), explained that Russo's counsel had failed to provide him all of the drawings Russo claimed to have disclosed in New York as Thomas had requested, *id.* 1405, and that after he had taken a good look at the document he realized he had not seen it before.  *Id.* 1402-03, 1409.

system (and, thus, in the patient's lungs) during cleaning.  *See id.* 1763-64, 1888-90, 1892.

Madsen, Ballard's project engineer, and Crump, his supervisor, conceived of the flapper valve concept in the fall of 1997.  *Id.* 1795.  They had considered various solutions to the problem, *id.* 1767, 1769-70, which they drew on a whiteboard in Crump's office.  *Id.* 1770-72, 1778-81, 1901-10, 3581-88.  They initially tried a duckbill valve as a simple, inexpensive solution to "locking off" the patient side of the system, but the duckbill valve presented problems.  *Id.* 1910.  Their eventual solution, the flapper valve, was based on a disk valve Ballard already used in unrelated products.  *Id.* 1905-06.

Crump's and Madsen's efforts initially had nothing to do with extending the use of the Trach Care product.  *Id.* 1906-07.  During early testing, however, they noticed that the catheter was cleaned much more quickly with less saline.  *Id.* 1925-26.  This was, in Madsen's terms, "one of those kind of neat moments where you saw something that you were not expecting."  *Id.* 1927.

Although the first tests of the product showed significantly more effective cleaning than Ballard's standard product, as well as those of some competitors, *id.* 1796, further testing was disappointing. *Id.* 1803. As the process continued, Madsen and Crump made a number of changes in the initial design, including adding a hole to the valve. *Id.* 1913-15. Sometime in early 1999, they thought of adding a second seal to the one already present in the Trach Care. *Id.* 1767, 1802-03, 1929, 1935, 2067. Ballard's studies going back to the early 1990s or earlier showed the efficiency of PEEP seals for wiping the catheter. *Id.* 1929. The second wiper or PEEP seal would ensure that the catheter's whole length was wiped clean. *Ibid.*

On July 20, 1999, Ballard applied for a patent on the flapper valve improvement, and on December 23, 1999, applied for a patent on an improved catheter having both a flapper valve and a second wiper seal. Those patents issued on May 8, 2001 and April 8, 2003, respectively. *Id.* 2845-79 (Ex. 35), 2880-911 (Ex. 36). Ballard also applied for and ultimately received FDA approval to market the new product

for 72-hour use, in contrast to the existing Trach Care's 24-hour approved use.  *Id.* 2052.

## V.    The Absence of Corroboration

As the foregoing facts indicate, whether Russo conveyed the alleged secrets to Lorenzen and Thomas at the New York meeting (the sole vector by which Russo claims to have conveyed such secrets to Ballard) hung upon Russo's word alone.  As discussed below at 37-51, however, Ballard contends that federal patent law requires a party challenging a patentee's inventorship to produce independent corroboration of his claim that he is the true inventor.  Although the district court ultimately rejected Ballard's contention, Ballard challenges that ruling on appeal.  This challenge necessitates review of the evidence Russo may advance as corroboration of his inventorship claim.

For example, to support his contention that he was working on an extended use version of Ballard's product even before Ballard called, Russo has pointed to an "Invention Disclosure Addendum" to one of his already-pending patent applications, dated February 9, 1997 and filed with the Patent

Office.[5]  *See id.* 2628-33 (Ex. 6A), 1185, 1187.  At trial, Russo

attempted to portray the Addendum as a step along the way to

Drawing No. 4/RD 478.  *Id.* 1185-88.  However, neither

"cleaning" nor "extended use" is mentioned anywhere in the

Addendum.  *Id.* 1163, 1166-67.  Nor does the Addendum

disclose a second wiper seal, and the only thing resembling a

duckbill valve is located in a different part of the catheter,

performing a different function.  *See id.* 2628-33 (Ex. 6A).

Prior to the trial, Russo told the Rhode Island district court

that "Drawing Number 4 . . . was something entirely different

from the invention disclosure that was filed with the

government."  Aplt.App. 699-700.  Russo admits that he never

sought patent protection for the product disclosed in the

Addendum, *id.* 1363, and that he never showed the Addendum

to Lorenzen or Thomas.  *Id.* 1411.

---

[5] Under Patent Office procedures, a putative inventor may file
a "Disclosure Document" that describes an invention for which
a patent application has not been filed.  Although the
Disclosure Document, which is not available to the public, is
not a patent application, the Patent Office will keep it on file
for two years to help to establish the conception date of an
invention if the inventor seeks a patent on it.  *See* MANUAL OF
PATENT EXAMINING PROCEDURES § 1706.

Similarly, Russo sent a fax to Lorenzen after Madsen's February 14, 1997 call. *Id.* 1175, 2635-36 (Ex. 7), 4884-84A. That fax contains no intimation that Russo was working on an extended use catheter or that he and Madsen had discussed such a product. Indeed, it references only the three pending patents which, Russo admits, were not infringed by Ballard. *Id.* 1337-39, 1365-66.

The first document actually exhibiting Russo's invention, RD 478 (Tab 11), is uncorroborated. Although Russo dated it "3-17-97," the drawing was not witnessed, and no one other than Russo knew it existed before the lawsuit began. Russo knew that it was important to corroborate inventions and knew how to do it, testifying to various methods by which an inventor could obtain third-party confirmation of the date of an invention, many of which he has used himself. *Id.* 1260-62. He used none of them here.

Instead, Russo pointed to a bound logbook which includes a reference to RD 478. *See id.* 1159, 2559-87 (Ex. 2A). The logbook, however, contains only a sequential list of drawings, not the drawings themselves. Thus, the entries

for RD 478 and related drawings in Russo's logbook read as follows:

| | | |
|---|---|---|
| RD 478 | Guardian adapter assembly | *RR* 3-17-97 |
| RD 479 | Guardian grommet | *RR* 3-17-97 |
| RD 480 | Guardian cap | *RR* 3-17-97 |
| RD 481 | Guardian housing | *RR* 3-17-97 |
| RD 482 | Guardian bushing | *RR* 3-17-97 |

*Id.* 2579 (Tab 10).

Nothing in these entries proves that the drawing Russo now identifies as RD 478 was created at the time of the logbook entries. In fact, the entries suggest a contrary conclusion. Russo says he would first create a drawing, apply a stamp and "RD" number to it, and then list the "RD" number in the logbook. *Id.* 1159-62. But the alleged invention reflected in RD 478 relates to a *closed* suction catheter, and Russo testified that the "Guardian" product was an *open* suction catheter. Aplt.App. 1250, 1255, 1259. In Russo's words, an open catheter (such as the Guardian) and a closed

catheter (such as the Trach Care) are "two different animals." *Id.* 1266. *See also id.* 1369 (Thomas); *id.* 2160 (Lorenzen).

The logbook entry for drawings RD 479 through 482, which supposedly depicted various components of the "Guardian" assembly shown in RD 478, raise more questions. Russo could not locate any of these drawings supposedly created at the same time as RD 478. *Id.* 1190, 1461. Although Russo characterized the missing drawings as relating to "unimportant elements" of his invention, all of which were displayed on RD 478, *id.* 1190, 1461, he conceded that none of the parts shown on Drawing No. 4 (or, hence, on RD 478) was labeled with a title that corresponded to the missing drawings. *Id.* 1461. At the same time, both RD 478 (Tab 11) and Drawing No. 4 (Tab 12), include other "unimportant elements" which are labeled, none of which corresponds to a "grommet," a "cap," a "housing," or a "bushing." And Russo did not explain why he would have prepared separate drawings of "unimportant" elements of his design but not of either of its two key components, the duckbill valve and the second wiper seal.

The CDA also is inconsistent with Russo's story.  In all
his dealings with Ballard, Russo insisted on a confidentiality
agreement before he would make any disclosure.  *Id.* 1247.
For purposes of preparing the CDA that would cover his
disclosures in connection with the New York meeting, Russo
provided Ballard with a description of the inventions that the
CDA was to cover:

> Dear Todd,  Thanks for your call to get the ball
> rolling on your confidential disclosure form.  I have
> three (3) inventions for sale.  They are:
>
> (1) Protective Suction Control Catheter with Valve—
> recently issued U.S. Patent No. 5,676,136 attached.
>
> (2) Thumb Conformable Suction Control Regulator—
> about to issue within the next several months.
>
> (3) Two Part Closed Tracheal Suction System—also
> about to issue within the next several months.
>
> You can use these titles in describing the inventions
> on the form.

Aplt.App. 1197-98, 2639 (Ex. 10).  On their face, these
descriptions (each of which expressly relates to an issued or
pending patent) do not include the improvements now in
dispute (for which Russo never filed a patent application).  The
subsequent CDA and all correspondence relating to it mention

only these three specific inventions; they contain no references to any additional invention, RD 478, a duckbill valve, a second wiper seal, or extended use catheters. *See generally id.* 2557-58 (Ex. 1) (Tab 7), 2640 (Ex. 11), 2641-43 (Ex. 12), 2645-48 (Ex. 14), 2649-50 (Ex. 15), 1419-20, 1423-24, 1429-30, 2172-76.

Even after the New York meeting, neither Drawing No. 4, nor the prototype, nor the concepts they embodied appears anywhere in the written record. When the parties began to exchange drafts of an option agreement pursuant to which Ballard would acquire Russo's inventions, they were styled as an option to purchase "any one or more of the patents," with "the patents" being specifically defined as the same inventions identified in the CDA. *See, e.g., id.* 1219, 2789-2840 (Exs. 24, 26-32).

Russo admitted that none of these draft agreements refers to Drawing No. 4, but asserted that it was implied by the references to the patents. *See, e.g., id.* 1456. However, Ballard's in-house lawyer, who drafted the agreements, testified that Russo never suggested including unpatented

technology, such as Drawing No. 4/RD 478, in the agreement, *id.* 1503, an assertion Russo did not contradict. The agreement Ballard's counsel drafted would have been different had something other than the patents been under discussion. *Ibid.* In particular, he would have attached drawings of any unpatented technology, as he had done in other cases, since his job was to capture in writing whatever assets Ballard was going to acquire. *Id.* 1530-31, 1541.

In short, the record reflects not a single witness other than Russo, nor a single document which a single witness other than Russo can authenticate, that corroborates his claimed prior invention of the subject matter of Ballard's patents.

## VI. Damages

To establish his damages, Russo submitted the testimony of Richard Hoffman, Jr., a certified public accountant. *Id.* 1668-69. Hoffman took Ballard's known sales of the Trach Care 72 for 2001 through 2005 and, using an assumed growth rate of 5% per year, projected Ballard's sales through 2018 (a date that Hoffman selected because it corresponds to the

expiration of Ballard's patents).  *Id.* 1678-79, 1682, 1685.
Based on these projections, Hoffman performed two different
calculations.

First, Hoffman calculated a royalty by applying to these
projected sales the minimum fee and 3% payment that Russo
had demanded in 1998 to license all the technology.  Hoffman
reduced the total projected payments through 2018
($3,157,000) to present value and added it to royalties on past
sales, resulting in a total royalty figure of $2,751,000.  *Id.*
1685-86, 2927-33.

Second, Hoffman used the same sales projection to
project Ballard's profits on the Trach Care 72 over the life of its
patents.  This he estimated to be $42,027,000 which, reduced
to present value and with interest on past profits, yielded
$32,357,841 in projected lost profits.  *Id.* 1695-97, 2927-33.

Hoffman admitted that he based the duration of the
damages period solely on the term of Ballard's patents.  *Id.*
1719.  He did so expressly on the theory that Ballard had
misappropriated Russo's trade secrets and patented them and
thus had obtained exclusive rights to Russo's ideas until 2018,

when Ballard's patents would expire.  *Id.* 1681-83, 1695, 1719.  He made no attempt (nor did any other witness for Russo) to demonstrate the likely longevity of Russo's "secret," independent of the exclusivity conferred by Ballard's supposedly ill-gotten patents.  Nor did he take into account that Ballard's obligations under the CDA, including the obligation to maintain Russo's information in confidence, expired in March 2000, two years after the CDA was executed.

Hoffman—who, as noted above, had been precluded from opining about the reasonableness of the 3% royalty rate— further confirmed that he was offering no opinion as to the reasonableness of the 3% rate demanded by Russo, either for all of the disclosed technology or for the specific trade secret at issue here; he simply assumed it for purposes of his calculation.  *Id.* 1704, 1707-08, 1712.  Ultimately, Russo submitted no evidence of the reasonableness of that royalty rate other than the fact that he had demanded it.

Hoffman also conceded that the Trach Care 72 incorporated many valuable features not attributable to Russo, *id.* 1737-38, yet he included 100% of Ballard's

supposed profits in his "unjust enrichment" analysis; he made no attempt to determine how much Russo actually contributed to those profits. *Id.* 1735, 1736 ("I haven't really looked at this"). Hoffman conceded that sales of Trach Care 72 products would reduce sales of the Trach Care 24 ("cannibalization"), but did not take this factor into account in calculating unjust enrichment. *Id.* 1698-99, 1730, 1732, 1744. He conceded that the Trach Care line already accounted for over 85% of the market for closed suction catheters and that the ratio of Trach Care 24 to Trach Care 72 sales had remained consistent at 10:1, *id.* 1657, 1731, but offered no explanation as to how the Trach Care 72 could enjoy a decade or more of 5% annual growth under these conditions. He thought it would be "unreasonable" for him to estimate many of Ballard's costs related to the Trach Care 72 and, as a result, did not attempt to account for them. *Id.* 1724-29.

Ballard presented the testimony of Peter Smith, a consultant and business school professor. Smith testified that Ballard had not yet recovered its own investment in the Trach Care 72, a conclusion based in part upon his higher estimate

of Ballard's development costs and in part on his determination that sales of the Trach Care 72 had cannibalized sales of the Trach Care 24. *Id.* 2294-303, 2309, 2312, 4891-99. Smith opined that, in a hypothetical negotiation in 1998, the parties would have agreed either on a lump sum royalty of approximately $150,000 or a 1% royalty for seven years (yielding approximately $150,000-$200,000). *Id.* 2312-19.

## SUMMARY OF ARGUMENT

The district court submitted Russo's claims to the jury under the wrong standard of proof. Although Russo did not directly seek to invalidate Ballard's patents, the factual predicate of his claims—that Russo was the true inventor of the product improvements covered by those patents—is irreconcilable with the presumption of inventorship to which Ballard was entitled by reason of its patents. This presumption, federal patent law provides, may not be overcome except with clear and convincing evidence and independent corroboration. The district court, however, allowed the case to go to the jury under the "mere

preponderance" standard with no requirement of independent corroboration. Since the record contains no such corroboration, the judgment in Russo's favor should be reversed; at a minimum, Ballard is entitled to a new trial with a properly-instructed jury.

Entirely aside from the tainted finding of liability, the jury's award vastly exceeded any amount Russo could rightfully have recovered even if he were the true inventor. Russo was awarded $20 million for the alleged misappropriation of a secret which, accepting his story at face value, he was willing to sell to Ballard for a royalty which, under the most favorable assumptions, would have yielded $2.75 million. Even if patent law permitted a putative inventor to recover the value of an idea under the guise of trade secret law (it does not), this should have represented the outer limit of Russo's recovery. Instead, the district court allowed the jury to give Russo not only Ballard's profits from the use of his alleged idea but profits from ideas, efforts, and capital for which Russo can claim no credit. And the district court allowed the jury to award those profits for 17 years (*i.e.*, until

the expiration of Ballard's patents), even though the CDA said Ballard was free to use Russo's ideas after two years, even though Russo never sought to patent those ideas, and even though any attempt by Russo to exploit them himself would immediately have destroyed their secrecy and, thus, their value.

The district court should have limited Russo's award to, at most, a reasonable royalty. Yet, even this component of the verdict was excessive; it was supported only by Russo's unilateral demand (not, as the law requires, objective evidence of reasonableness) to license a cluster of inventions, including not only the one Ballard allegedly misappropriated, but several that it unquestionably did not.

For all these reasons, the judgment should be reversed.

## ARGUMENT

## I. THE VERDICT MAY NOT STAND IN THE ABSENCE OF FINDINGS AND PROOF THAT RUSSO SATISFIED PATENT LAW INVENTORSHIP STANDARDS.

### A. Standard of Review/Preservation of Error

Appellate review of jury instructions is *de novo*.

*Townsend v. Lumbermens Mut. Cas. Co.*, 294 F.3d 1232, 1237

(10th Cir. 2002).  Where an appellate court determines that instructions were erroneous, "the judgment must be reversed 'if the jury might have based its verdict on the erroneously given instruction.'"  *Wankier v. Crown Equip. Corp.*, 353 F.3d 862, 867 (10th Cir. 2003) (quoting *Townsend*).  Jury instructions on the burden of proof "are almost always crucial to the outcome of the trial," and, hence, an error instructing on that burden can never be harmless if it relates to a key element of the claim.  *Stevison by Collins v. Enid Health Sys., Inc.*, 920 F.2d 710, 714 (10th Cir. 1990).  *See also Menne v. Celotex Corp.*, 861 F.2d 1453, 1470-71 (10th Cir. 1988).

Likewise, review of a district court's denial of a motion for judgment as a matter of law is *de novo*; reversal is required if, viewing the evidence and permissible inferences in the light most favorable to the non-moving party, this Court concludes that judgment for the movant was required as a matter of law.  *Mason v. Texaco, Inc.*, 948 F.2d 1546, 1554-55 (10th Cir. 1991).

Ballard raised the issue of the appropriate standard of proof on numerous occasions.  It moved for summary

judgment based on Russo's failure to satisfy federal patent law standards of inventorship, Aplt.App. 110-57, 263-74, and asked for instructions and special verdict forms that would have required Russo to prove inventorship in accordance with such standards. *Id.* 336, 373, 394-95, 497, 2101. It also moved for a directed verdict, *id.* 1746-49, and for judgment as a matter of law (or, in the alternative, a new trial) for Russo's failure to satisfy those standards. *Id.* 561-586, 636-646.

**B.  A State Law Claim Whose Elements Are Factually Inconsistent with a Patentee's Presumption of Inventorship Cannot Be Maintained Unless the Plaintiff Satisfies Federal Patent Law Standards for Overcoming That Presumption.**

Federal patent law provides the exclusive protection for inventions. *See Sears, Roebuck & Co. v. Stiffel Co.*, 376 U.S. 225, 231-33 (1964); *Compco Corp. v. Day-Brite Lighting, Inc.*, 376 U.S. 234, 237-39 (1964). Although federal patent law does not preempt state trade secret or other claims that cover conduct not bearing on federal patent policies, *see Kewanee Oil Co. v. Bicron Corp.*, 416 U.S. 470 (1974), states are not free to reward inventors for inventions *per se*; that is the exclusive

province of patent law. *See Bonito Boats, Inc. v. Thunder Craft Boats, Inc.*, 489 U.S. 141, 164-66 (1989).

Patent law, in turn, provides that the only person entitled to a patent—and, hence, the only one entitled to protection of an invention *per se*—is the first person to conceive of an idea and reduce it to practice. *See generally* 35 U.S.C. §§ 101-103. Once a patent issues, it is presumed valid. 35 U.S.C. § 282. And from that presumption follows another: "that the named inventors on a patent are the true and only inventors." *Gemstar-TV Guide Int'l, Inc. v. Int'l Trade Comm'n*, 383 F.3d 1352, 1381 (Fed. Cir. 2004); *Eli Lilly & Co. v. Aradigm Corp.*, 376 F.3d 1352, 1358 (Fed. Cir. 2004).

The presumption that the patentee invented the patented invention can be overcome, but only as permitted under patent law. A party seeking to prove that he, rather than the named inventor, invented the subject matter of the patent "must prove both prior conception of the invention . . . and communication of that conception to the patentee" by clear and convincing evidence. *Gambro Lundia AB v. Baxter HealthCare Corp.*, 110 F.3d 1573, 1576 (Fed. Cir. 1997). This

requires independent corroboration of the plaintiff's testimony with respect to both conception and communication (or, put otherwise, objective, third-party evidence of the plaintiff's fact of invention, date of invention, and communication to another). *Ibid.*; *Price v. Symsek*, 988 F.2d 1187, 1194-96 (Fed. Cir. 1993).

To ensure that federal patent law is not undermined by state law, federal standards must be used where state claims depend upon proof of inventorship. *Univ. of Colo. Found., Inc. v. American Cyanamid Co.*, 196 F.3d 1366, 1371-72 (Fed. Cir. 1999). In *American Cyanamid,* plaintiffs claimed (as Russo does here) that the defendant had misappropriated their invention and obtained a patent on it without their knowledge or permission. The trial court awarded plaintiffs damages for fraudulent nondisclosure of the patent application and (like Russo here) for unjust enrichment. On appeal, the Court considered whether that judgment could stand where plaintiffs' claims hinged on the contention that plaintiffs were the true inventors of the invention on which defendant held a patent. The Court began with the proposition that "[t]he field

of federal patent law preempts any state law that purports to define rights based on inventorship." *Id.* at 1372. Even though the plaintiffs' state law claims themselves were not preempted, federal patent law still governed whether plaintiffs or defendant had invented the technology at issue. "A different state inventorship standard," warned the Court,

> might grant property rights to an individual who would not qualify as an inventor under federal patent law, or might grant greater relief to inventors than is afforded by federal patent law. Either situation might frustrate the dual federal objectives of rewarding inventors and supplying uniform national patent law standards.

*Ibid.* Because plaintiffs' claim that they invented the patented idea had not been assessed under federal inventorship standards, the case was remanded for retrial under federal law standards.

The principle underlying *American Cyanamid* has recently been reaffirmed by the Federal Circuit. *See Stern v. Trs. of Columbia Univ.*, 434 F.3d 1375, 1376-77 (Fed. Cir.), *cert. denied*, ___ U.S. ___, 127 S. Ct. 83 (2006). It also is consistent with a host of other decisions that impose federal patent standards on any element of a state or federal law

claim that is expressly or implicitly inconsistent with a patentee's presumption of inventorship. *See, e.g., Hunter Douglas,* 153 F.3d at 1335-37 (state law claim based on defendants' assertion of an exclusive right to make or sell window shades covered by allegedly invalid and/or unenforceable patents was preempted unless plaintiff could satisfy federal standards for overcoming patent); *Dow Chem. Co. v. Exxon Corp.*, 139 F.3d 1470, 1475 n.4 (Fed. Cir. 1998) (state law unfair competition claim based on allegedly inequitable conduct in the prosecution of defendant's patent would have to be proved by clear and convincing evidence in accordance with federal law); *Nobelpharma AB v. Implant Innovations, Inc.*, 141 F.3d 1059, 1067-68 (Fed. Cir. 1998) (whether conduct in the prosecution of a patent is sufficient to strip a patentee of its antitrust immunity must be decided under patent law); *Abbott Labs. v. Brennan*, 952 F.2d 1346, 1356 (Fed. Cir. 1991) (state law claim for abuse of process based on defendant's actions before Patent Office must satisfy federal standards). *Cf. U.S. Valves, Inc.*, 212 F.3d at 1372 (claim by licensee that licensor breached exclusive license to

sell patented valves required court to interpret patents under federal patent law).

The district court, however, concluded that the rule of *American Cyanamid* applied only where plaintiff's claims "directly implicate the validity of [the defendants'] patents or would otherwise affect [defendants'] property interests in those patents." Aplt.App. 300 (Tab 5 at 19). In fact, nothing in *American Cyanamid* indicates its rule is so limited. Like Russo's claims, those asserted by the plaintiffs in *American Cyanamid* (not to mention *Stern, Hunter Douglas,* and *Dow Chemical*) were *factually inconsistent* with defendants' inventorship; they "implicate[d] the validity" of the defendants' patents neither more nor less than Russo's claims implicate Ballard's patents. Although the plaintiff University in *American Cyanamid* sought equitable title to the patent, that played no role in the Court's discussion of the need to apply federal inventorship standards to the plaintiff doctors' separate state law claims. *See* 196 F.3d at 1375.

Likewise, neither *C&F Packing Co. v. IBP, Inc.*, 224 F.3d 1296 (Fed. Cir. 2000), nor *Uroplasty, Inc. v. Advanced*

*Uroscience, Inc.*, 239 F.3d 1277 (Fed. Cir. 2001), also cited by the district court, can be read to permit a plaintiff to recover on a state law claim whose elements are factually inconsistent with an existing patent without satisfying the patent law standards of proof. In *C&F*, an action for misappropriation of trade secrets, *inventorship was not at issue.* Similarly, in *Uroplasty* there was no suggestion that the secret allegedly misappropriated from the plaintiff was the same invention on which the defendant held a patent.

In short, Russo's claims squarely implicate the rule of *American Cyanamid*; it cannot be distinguished away.

### C. Russo's Claims are Diametrically Inconsistent with the Presumption of Inventorship Arising from Ballard's Patents.

Russo's claims depended upon establishing that he, and not Crump and Madsen, was the true inventor of the subject matter of Ballard's patents. From the first day of trial, Russo's claim was that Ballard had patented "his" invention. His counsel told the jurors in his opening statement that Ballard "t[ook] his ideas" and "filed a couple patents" claiming Russo's invention, Aplt.App. 1112, and that Ballard had patented

"exactly what Mr. Russo had shown them in Drawing number four." *Id.* 1113. In Russo's own words, Ballard's '451 patent "contain[s] all of [his] inventive ideas" and is "exactly the same" as his invention. *Id.* 1230. Russo's expert calculated damages through 2018, the expiration date of the Ballard patents, on the "understanding that Kimberly-Clark [*sic*] took the Drawing Number Four and took the trade secrets and received a patent on that." *Id.* 1682. This theme continued throughout the trial. *See, e.g., id.* 1230 (Ballard patent is "exactly the same" as Drawing No. 4), 1229-30, 1231-33, 2363, 2390.

There also can be no doubt that Russo's claim is irreconcilable with Ballard's patents. Ballard's patents raised a presumption that Crump and Madsen were the "true and only inventors," *Gemstar-TV*, 383 F.3d at 1381, *i.e.*, that they first conceived of and reduced to practice the tracheal catheter with a flapper valve and second seal. If that is so, then Ballard could not have misappropriated the idea, "secret" or otherwise, from Russo, and his theories of damage, discussed below in section II, make no sense.

Thus, without simultaneously establishing his own inventorship and negating that of Ballard's inventors, Russo has no case. And, as *American Cyanamid* and *Stern* unequivocally hold, Ballard's federal law inventorship presumption cannot be overcome with anything less than clear and convincing evidence and independent corroboration.

### D. Patent Law Requires Reversal or, at the Very Least, a New Trial.

There is no question that the jury instructions fell far short of patent law standards. Aplt.App. 536, 541. As noted above, an error instructing on the burden of proof is always prejudicial. *Stevison*, 920 F.2d at 714. At the very least, therefore, Ballard is entitled to a new trial.

Moreover, where the evidence the plaintiff presented at trial would not satisfy the appropriate standard, it is proper to render judgment for the defendant rather than remand for a new trial. *Boyle v. United Techs. Corp.*, 487 U.S. 500, 513 (1988); *Coleman v. B-G Maint. Mgmt. of Colo., Inc.*, 108 F.3d 1199, 1205 (10th Cir. 1997). Here, Russo submitted no evidence of independent corroboration, nor could any

reasonable jury have concluded that he produced clear and convincing evidence that he invented the subject matter patented by Ballard. Judgment should have been entered in favor of Ballard as a matter of law.

Russo's assertion that he was the first to have conceived of the idea was supported by nothing but his own testimony and documents he created, lacking any third-party corroboration. The only evidence Russo presented to establish his conception of the flapper valve and second seal was (1) his own testimony; (2) RD 478 and Drawing No. 4; (3) his logbook referring to RD 478; and (4) a prototype showing the flapper valve but not the second seal. No evidence other than Russo's own testimony establishes that these were created before Ballard's patent application.[6] Moreover, the only means by which Russo claims he communicated to Ballard the ideas contained in Drawing No. 4 and the prototype was the luncheon conference in April 1998. Yet, both Ballard

---

[6] Even if the position of the RD 478 logbook *entry* on a particular page and line of Russo's bound logbook were viewed as evidence of the date of the entry itself, it would not prove that the drawing Russo says was RD 478 was the drawing to which the entry refers.

representatives present at the luncheon, Lorenzen and Thomas, deny that they saw Drawing No. 4 or any prototype exhibiting either a duckbill or flapper valve or a second seal. Aplt.App. 1386-87, 2232-33.[7] Thus, it is Russo's word alone upon which his claim of inventorship depends. But that evidence is insufficient as a matter of law.

"[T]he case law is unequivocal that an inventor's testimony respecting the facts surrounding a claim of derivation or priority of invention cannot, standing alone, rise to the level of clear and convincing proof." *Price*, 988 F.2d at 1194. The putative inventor must present independent corroboration of the fact of invention, the date of invention, and the communication of the invention to another. *Id.* 1194-96. "The requirement of independent knowledge remains key to the corroboration inquiry." *Medichem, S.A. v. Rolabo, S.L.*, 437 F.3d 1157, 1170 (Fed. Cir. 2006). Where documentary evidence depends solely on the inventor's

---

[7] As noted above, Thomas initially displayed some confusion on this point at his deposition, but was unequivocal, both at deposition and at trial, once he focused on the distinct elements of Drawing No. 4. *See* Aplt.App. 1403.

testimony for authentication, that evidence has no corroborative value. *See id.* 1170-71 (*citing Reese v. Hurst*, 661 F.2d 1222, 1225 (C.C.P.A. 1981)). Thus, an unwitnessed inventor's notebook is insufficient corroborating evidence to satisfy the clear and convincing evidence standard as a matter of law. *See id.* 1172-73; *Stern*, 434 F.3d at 1378 ("regardless of the contents of the notebooks, unwitnessed laboratory notebooks on their own are insufficient to support [a] claim of" prior conception and inventorship); *Reese*, 661 F.2d at 1232 (same); *Hahn v. Wong*, 892 F.2d 1028, 1033 (Fed. Cir. 1989) ("affiants' statements that by a certain date they had 'read and understood' specified pages of Stephen Hahn's laboratory notebooks did not corroborate a reduction to practice . . . [because] [t]hey established only that those pages existed on a certain date . . . [and] did not independently corroborate the statements made on those pages").

Because Russo failed to provide clear and convincing evidence, including independent corroboration, to prove that he invented the subject matter claimed in Ballard's patents, Ballard is entitled to judgment as a matter of law. At a

minimum, the district court's error warrants a new trial,
*Stevison*, 920 F.2d at 714, and on both liability and damages
as well. *Gasoline Prods. Co. v. Champlin Ref. Co.*, 283 U.S.
494, 500 (1931).

## II. THE DAMAGES AWARDED WERE EITHER UNAVAILABLE AS A MATTER OF LAW, EXCESSIVE, OR BOTH.

Even if the liability verdict is allowed to stand, these
damages cannot.

### A. Standard of Review/Preservation of Error

As noted above, appellate review of jury instructions is
*de novo*. *Townsend*, 294 F.3d at 1237. Likewise, whether the
district court applied the proper test in admitting expert
evidence is reviewed *de novo*, *Champagne Metals v. Ken-Mac
Metals, Inc.*, 458 F.3d 1073, 1079 (10th Cir. 2006), as is the
court's construction of state statutes (such as the Utah Trade
Secrets Act). *FDIC v. Hamilton*, 122 F.3d 854, 857 (10th Cir.
1997). Mixed questions of law and fact are reviewed under
either the *de novo* or the clearly erroneous standard,
depending on whether the inquiry is primarily legal or factual.
*Armstrong v. Comm'r*, 15 F.3d 970, 973 (10th Cir. 1994).

Economic damages—the only type at issue here—must be "based on reasonable proof" and "supported by competent evidence."  *See, e.g., Fitzgerald v. Mountain States Tel. & Tel. Co.*, 68 F.3d 1257, 1264 (10th Cir. 1995); *Thompson v. Shelter Mut. Ins.*, 875 F.2d 1460, 1463 (10th Cir. 1989).  Thus, a damage award which is inconsistent with the contractual measure of recovery or for which plaintiff fails to establish a sufficient causal nexus may not stand.  *Morrison Knudsen Corp. v. Fireman's Fund Ins. Co.*, 175 F.3d 1221, 1242-48, 1259-61 (10th Cir. 1999).  Where the record does not contain substantial evidence sufficient to support the jury's award, moreover, this Court may fashion a remedy based on the maximum amount of damages reasonably supported by the record; this may require the trial court to enter an order for remittitur reducing the damage award or in the alternative granting a new trial.  *K-B Trucking v. Riss Int'l Corp.*, 763 F.2d 1148, 1162-63 (10th Cir. 1985).

Ballard repeatedly raised the various damage issues addressed in this section.  Among other things, Ballard moved to strike portions of the testimony of Russo's expert, Aplt.App.

225-237, 276-280, moved to limit Russo's damages, *id.* 338-360, 472-482, asked for certain instructions that were rejected and objected to those given, *id.* 328, 381-85, 394, 405-09, 491, 494-95, 506-08, 2111-13, and brought post-verdict motions directed at these issues. *Id.* 561-65, 593-613, 647-56.

## B. The Award Invaded the Realm of Patent Law Not Only by Compensating Russo for the Value of The Invention *Per Se*, But Also by Using a Greater Measure of Damages Than That Allowed by Patent Law.

Having allowed Russo to avoid the higher standards of proof applicable to inventorship claims because he purportedly was proceeding only on trade secret-based theories, the district court should have limited Russo's recovery to damages appropriate to misappropriation of such a secret. Instead, the court allowed the jury to award Russo damages for the value of the invention *per se*, calculated over the life of Ballard's patents, on the premise that Russo was their "inventor." This award represents a value protected exclusively by patent law.

As noted above, states are not free to reward inventors for inventions *per se*. *Bonito Boats*, 489 U.S. at 164-66. For

this reason, an award of damages against a patentee for manufacturing products embodying information allegedly disclosed to the patentee by the plaintiff (but which the plaintiff has not protected under the federal patent laws) invades the realm of patent law *except* to the extent that the plaintiff bestowed on the defendant an incremental benefit over and above the ideas protected by the patent.  *See Ultra-Precision Mfg., Ltd. v. Ford Motor Co.*, 411 F.3d 1369, 1377-82 (Fed. Cir. 2005).  *See also Univ. of Colo. Found., Inc. v. American Cyanamid Co.*, 342 F.3d 1298, 1307 (Fed. Cir. 2003) ("*American Cyanamid II*") (approving limitation of plaintiffs' recovery to incremental profits derived from use of idea, rather than total profits from selling product incorporating idea); *Hunter Douglas,* 153 F.3d at 1335 (state law remedy based on conduct protected or governed by federal patent law is preempted).

The lesson is clear: any award of damages that compensates a plaintiff for the value of an invention on which he or she does not hold a patent impermissibly invades the realm of patent law.  Accordingly, if Russo is entitled to any

compensation, it is compensation limited to the "incremental value" he bestowed on Ballard over and above the invention itself.

The jury, however, did not limit its award to any such "incremental" value, but instead awarded Russo the value of the Ballard patents through their expiration. A trade secret derives its value (if any) from "not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use." UTAH CODE ANN. § 13-24-2(4)(a). Other than its potential to provide a "head start," discussed below at 68-70, the "secrecy" of *this* invention had little, if any, independent value: the invention could not have been exploited without a simultaneous loss of secrecy.[8] For this reason (among others),

_____

[8] As Russo conceded at trial, this is apparent from the very nature of the "secret," which consists of two readily observable mechanical characteristics. *See* Aplt.App. 2370 (Russo's closing) ("[O]nce you show the prototype, there are no secrets. You've now told everybody how this works"). Unlike hidden manufacturing processes or chemical formulae (*e.g.*, the recipe for Coca-Cola®), which can be exploited without loss of secrecy, the nature of "Russo's" idea would have been apparent, and any secrecy lost, the instant a patent was published or a product embodying the invention was

the duration of a patent is irrelevant to trade secret damages. Douglas G. Smith, *Application of Patent Law Damages Analysis to Trade Secret Misappropriation Claims: Apportionment, Alternatives, and Other Common Limitations on Damages*, 25 SEATTLE U. L. REV. 821, 843 (2001-02).  Yet, both components of the verdict—the $17 million award for unjust enrichment and the $3 million royalty award for breach of contract—were calculated over the lives of Ballard's patents. *See, e.g.,* Aplt.App. 1719 (Hoffman calculated damages to 2018 "because that is when the Ballard patents expire").  The jury thus was asked to award, and did award, Russo damages for the value of the invention *per se*.  This violates patent law. *See Bonito Boats*, 489 U.S. at 164-66; *Ultra-Precision*, 411 F.3d at 1377-82.

Not only does it offend patent law to reward Russo *at all* for an invention on which Ballard holds the patent, but to award Russo *Ballard's profits* compounds the offense.  Patent

marketed.  *See, e.g., Schreyer v. Casco Prods. Corp.,*190 F.2d 921, 924 (2d Cir. 1951); *Roboserve, Ltd. v. Tom's Foods, Inc.,* 940 F.2d 1441, 1455 (11th Cir. 1991); *see also* UNIFORM TRADE SECRETS ACT § 2 cmt., 14 U.L.A. 589 (2005 main volume).

law does not allow a plaintiff to recover the alleged infringer's profits; the statute permits a patentee to recover only its *own* lost profits or royalty damages, 35 U.S.C. § 284; Roger D. Blair & Thomas F. Cotter, *An Economic Analysis of Damages Rules in Intellectual Property Law*, 39 WM. & MARY L. REV. 1585, 1595-96 (1998); JOHN W. SCHLICHER, PATENT LAW: LEGAL AND ECONOMIC PRINCIPLES § 9.04[2][6] at 9-31 (2001). The irony is palpable: even though Russo did not satisfy the standards necessary to overcome Ballard's patents, he was awarded far more damages than he could have recovered if he had. Such a result is irreconcilable with patent law. *See American Cyanamid*, 196 F.3d at 1372 (state law may not "grant greater relief to inventors than is afforded by federal patent law").

C. **The Remedy of Unjust Enrichment Should Not Have Been Available to Russo Under These Facts.**

Questions of patent law aside, the award of damages is unsupportable for a host of reasons.

### 1. The Utah Trade Secrets Act prohibits an award of both Ballard's profits and a royalty.

Under the Utah Trade Secrets Act, it is improper to award both unjust enrichment damages and a reasonable royalty. *See* UTAH CODE ANN. § 13-24-4(1) (reasonable royalty is "in lieu of damages measured by any other methods"). This is not surprising; it is inconsistent to both impose a royalty for the right to use an idea and take the profits from such use. Yet, the jury did just that. All other defects aside, therefore, the award is duplicative.

For the reasons discussed immediately below, if either component of the award can survive, it is only a royalty. And, for the reasons discussed below at 72-75, even that component of the award is excessive.

### 2. Unjust enrichment is not an appropriate measure of damages where, as here, the plaintiff intended to license his (alleged) invention to the defendant.

It is undisputed that, whatever intellectual property Russo disclosed to Ballard, he was willing to license it to Ballard. *See, e.g.*, Aplt.App. 1215-19, 1227-28. That being so,

to allow him to recover Ballard's profits in addition to a royalty put him in a far better position than he would have occupied had there been no breach.

Although numerous cases have awarded trade secret plaintiffs a portion of the defendant's profits as unjust enrichment, that measure of damage is most appropriate when the defendant has used the misappropriated trade secret to offer goods or services that compete with the plaintiff's. *Mid-Michigan Computer Sys., Inc. v. Marc Glassman, Inc.*, 416 F.3d 505, 510 (6th Cir. 2005). In that situation, the defendant's profits from the misappropriation serve as a proxy for the plaintiff's lost profits. *Design Innovation, Inc. v. Fisher-Price, Inc.*, 463 F. Supp. 2d 177, 179-80, 182-84 (D. Conn. 2006) (analyzing cases). Where, however, the plaintiff intended from the beginning to license its trade secret, courts have limited recovery to a reasonable royalty. In the words of one court, such plaintiffs "are entitled to recover merely what would have been theirs if defendant had done what it should have done." *Saco-Lowell Shops v. Reynolds*, 141 F.2d 587, 598 (4th Cir. 1944).

Thus, in *Celeritas Techs., Ltd. v. Rockwell Int'l Corp.*, 150 F.3d 1354 (Fed. Cir. 1998), the parties entered into a nondisclosure agreement "with the reasonable expectation that [defendant] would compensate [plaintiff] for any use made of the disclosed information." *Id.* at 1359. Defendant proceeded to use the information without compensation. The court concluded that the appropriate measure of damage was the amount defendant would have paid for the technology had it not breached the contract, *i.e.*, a reasonable royalty, and not the statutory measure of damages that might have otherwise governed. *Id.* at 1359-60. A similar result was reached in *Learning Curve Toys, Inc. v. PlayWood Toys, Inc.*, 342 F.3d 714 (7th Cir. 2003), in which the plaintiff, who had disclosed the idea in question in anticipation of licensing it to the defendant, was entitled to a royalty for the license that would have been negotiated absent the defendant's misappropriation. Numerous other cases have reached the same conclusion.[9]

---

[9] *See, e.g.*, *Design Innovation*, 463 F. Supp. 2d at 184 (reasonable royalty where parties had entered into option contract and plaintiff was in no position to sell the product itself); *Mid-Michigan Computer Sys.,* 416 F.3d at 511

These cases reflect a more fundamental principle that cuts across virtually all theories of recovery in the law: a plaintiff should not be placed in a better position than it would have occupied in the absence of breach.  *See, e.g., Ford v. American Express Fin. Advisors, Inc.*, 98 P.3d 15, 26 (Utah 2004) (contracts) (quoting *Soules v. Indep. Sch. Dist.*, 258 N.W.2d 103, 106 (Minn. 1977)); *Kilpatrick v. Wiley, Rein & Fielding*, 37 P.3d 1130, 1145 (Utah 2001) (same; torts); *see also* 11 JOSEPH M. PERILLO, CORBIN ON CONTRACTS § 55.3 at 8 (rev'd ed. 2005).  Here, had the alleged breach never occurred, Russo would have received, at most, a royalty calculated by

---

(reasonable royalty based on liquidated damage clause for use of information beyond scope of license); *Laurie Visual Etudes, Inc. v. Chesebrough-Pond's, Inc.*, 432 N.Y.S.2d 457, 463 (N.Y. Sup. Ct. 1980) (limiting recovery to a reasonable royalty, despite plaintiff's insistence on manufacturing goods and selling to defendant, where plaintiff "never had the capacity or knowledge profitably to market its device"), *rev'd on liability*, 441 N.Y.S.2d 88 (Sup. Ct. App. Div. 1981); *Vitro Corp. v. Hall Chem. Co.*, 292 F.2d 678 (6th Cir. 1961) (reasonable royalty for breach of a nondisclosure agreement); *E. L. Bruce Co. v. Bradley Lumber Co.*, 79 F. Supp. 176, 189 (W.D. Ark. 1948) (court limits award for misappropriation of trade secrets to license fees defendant would have paid but for defendant's cancellation of license agreement).

his expert to be $2,751,000. Aplt.App. 1686. This should have been the outer limit of his recovery.

###   3.   Nor is unjust enrichment available where, as here, the plaintiff fails to limit his claim to profits attributable to his idea.

Even where an award of unjust enrichment is appropriate, the Utah Trade Secrets Act limits recovery to enrichment "*caused by* misappropriation." UTAH CODE ANN. § 13-24-4(1) (emphasis added). Accordingly, a plaintiff is entitled only to those portions of the misappropriator's profits attributable to the misappropriation. A plaintiff may not simply lay claim to *all* profits generated by the accused product. Yet, Russo was allowed to do just that.

The vast majority of cases considering the issue have held not only that it is plaintiff's burden to apportion profits and tie them directly to the asserted secret, but that failure to do so will preclude *any* disgorgement of profits. *See, e.g., Schiller & Schmidt, Inc. v. Nordisco Corp.*, 969 F.2d 410, 415-16 (7th Cir. 1992); *Alcatel USA, Inc. v. Cisco Sys.*, 239 F. Supp. 2d 660, 670-71 (E.D. Tex. 2002); *KW Plastics v. U.S. Can Co.*, 131 F. Supp. 2d 1289, 1295 (M.D. Ala. 2001); *Softel,*

*Inc. v. Dragon Med. & Scientific Commc'ns, Inc.*, 891 F. Supp. 935, 943 (S.D.N.Y. 1995).  *See also Univ. Computing Co. v. Lykes-Youngstown Corp.*, 504 F.2d 518, 539 (5th Cir. 1974); RESTATEMENT (THIRD) OF UNFAIR COMPETITION § 45, cmt. f (1995).

Where, moreover, the success of the product incorporating the misappropriated trade secret is due in large part to defendant's independent contributions, a reasonable royalty is the best measure of a plaintiff's damages; this is particularly so where the plaintiff does not have the capacity profitably to market its device.  *See, e.g., Goldberg v. Medtronic, Inc.*, 686 F.2d 1219, 1229 (7th Cir. 1982) (plaintiff would not have been able to exploit the trade secret himself and would have eventually licensed the idea); *Olson v. Nieman's, Ltd.*, 579 N.W.2d 299, 309-10 (Iowa 1998) (plaintiff was unable to establish other damages with certainty); *Laurie Visual Etudes,* 432 N.Y.S.2d 463 (plaintiff lacked ability to market its device).  *See also* Craig N. Johnson, *Assessing Damages for Misappropriation of Trade Secrets*, COLO. LAW., Aug. 27, 1998 at 71, 73.

It is undisputed that the Trach Care 72 includes many valuable features that have no connection whatsoever to Russo. Russo himself acknowledged that Ballard designed and owned the vast majority of its components. Aplt.App. 1449-50. Ballard owns numerous patents on technology incorporated into Trach Care 72 that are not implicated in any way by Russo's claims. *Id.* 1215. The value of Trach Care 72 also is affected by other factors, such as Ballard's established brand name and goodwill. *Id.* 1735-38.

Despite these facts, Russo made essentially no attempt to account for the roles these other factors play in Ballard's Trach Care 72 profits. *Id.* 1735 (Hoffman admits he measured profits from Trach Care 72 "without any effort to try and determine what [Russo's] alleged contribution was to that product"). Rather, Russo simply asserted that *all* the profits belonged to him. Given that position, *none* do. *See, e.g., Schiller & Schmidt*, 969 F.2d at 415-16; *Alcatel*, 239 F. Supp. 2d at 671; *KW Plastics*, 131 F. Supp. 2d at 1295.

**D. Even Assuming That Unjust Enrichment Was Available, Under No Circumstances Was Russo Entitled to Recover Ballard's Profits for the Duration of Ballard's Patents.**

As compensation for misappropriation of a "secret," Russo claimed all of the profits for 17 years on technology that he never patented, that the CDA said Ballard was free to use after two years, and that could have been easily copied the moment Russo tried to exploit it.  This is untenable.

A trade secret derives its value, if any, from not being generally known.  UTAH CODE ANN. § 13-24-2(4)(a).  Unlike the owner of a patent, the holder of a putative secret has no right to prevent its use once it loses its secrecy.  *See, e.g.,* UTAH CODE ANN. §§ 13-24-3(1), 13-24-3(2).  Thus, "a monetary recovery for trade secret misappropriation is appropriate only for the period in which information is entitled to protection as a trade secret, plus the additional period, if any, in which a misappropriator retains an advantage over good faith competitors because of misappropriation."  UNIFORM TRADE SECRETS ACT § 3 cmt., 14 U.L.A. 589 (2005 main volume).

In this case, three factors limit the period of time for which Russo could have prevented Ballard's use of his alleged secrets:  (1) the express term of the CDA; (2) the date upon which Russo's idea was or would have been disclosed to the public had he attempted to exploit it; and (3) the period it would have taken Ballard to develop the idea independently had Russo never disclosed it.  The jury's $17 million award cannot be reconciled with any of these limits.

### 1.    The Confidential Disclosure Agreement

According to Russo, he disclosed his trade secret to Ballard pursuant to the CDA.  But the obligations imposed by the CDA were not perpetual.  Quite to the contrary, the CDA specified that Ballard's obligations (including the duty to maintain the confidentiality of the information disclosed) "shall continue for a period of two (2) years from the date of this Agreement, *at the end of which time they shall terminate*." Aplt.App. 2558 (Tab 7 at ¶ 4) (emphasis added).[10]  The

---

[10] The trial court concluded that, "under the plain language of the contract, the duty of confidentiality did not expire after two years."  Aplt.App. 488 (Tab 4 at 1).  There is, however, no

Agreement also disclaimed any obligation on Ballard's part to pay any royalties or other consideration with respect to the information disclosed. *Id.* ¶ 6. In other words, according to the express terms of the Agreement, Ballard was free to use the alleged secret after March 27, 2000, even if it did not enter into a royalty or licensing agreement with Russo.

This is not unusual. From the manufacturer's perspective, a finite temporal limitation is essential; no manufacturer wants its hands tied forever. From the inventor's perspective, a finite limitation is sufficient; if the idea has value, he will be able to apply for a patent and/or license the idea to another party within the protected period. Here, however, Russo chose to do neither.

Because by his own agreement Russo could not have prohibited Ballard's use of his ideas after two years, Russo's recovery of Ballard's profits should have been limited to two years. *See MedSpring Group, Inc. v. Feng*, 368 F. Supp. 2d 1270, 1280 (D. Utah 2005) (trade secret plaintiff's damages

---

language in the CDA, "plain" or otherwise, creating any exception to this termination clause.

were limited to the period covered by the parties' nondisclosure agreement).

### 2. Actual or constructive disclosure

Since Ballard had no obligation to license the idea from Russo, *see* Aplt.App. 2558 (Tab 7 at ¶ 6), the only way Russo could have profited from his idea without licensing Ballard would have been to license a third party. Russo testified he had no intention of doing so, Aplt.App. 1227-28, but even if he had, Ballard, and anyone else, would then have been free to use his ideas, since the "secrets" would have entered the public domain as soon as his licensee began selling products incorporating them. *See supra* at p. 55-56 & n.8. This, too, severely limits the temporal value of Russo's "secret."

### 3. The "head start" rule

The Uniform Trade Secrets Act, which Utah has adopted, limits both injunctive and compensatory relief to the period of time during which the misappropriator gained a competitive advantage. *See, e.g.,* UNIFORM TRADE SECRETS ACT § 2 cmt., 14 U.L.A. 589 (2005 main volume); *id.* § 3 cmt; RESTATEMENT (THIRD) OF UNFAIR COMPETITION § 44, cmt. f (1995); *id.* § 45

cmt. h.  Thus, proof that a defendant misappropriated a trade secret allows a plaintiff to recover profits only during the "head start" period—that is, the time the misappropriator saved in getting to market by reason of the misappropriation—plus savings in engineering and development costs resulting from the misappropriation.  *See, e.g.*, *Telex Corp. v. IBM Corp.*, 510 F.2d 894, 928-33 (10th Cir. 1975); *Sokol Crystal Prods., Inc. v. DSC Commc'ns Corp.*, 15 F.3d 1427, 1433 (7th Cir. 1994); ABA MODEL JURY INSTRUCTIONS: BUSINESS TORTS LITIGATION, Instruction 8.6.4.  "The point of the 'head start' period," explained one court,

> . . . is that, once the defendant has discovered, or would have discovered, the trade secret without the misappropriation, any lost profits from that time forward are not caused by the defendant's wrongful act.

*Sokol Crystal Prods., Inc.,* 15 F.3d at 1433.  *See also* UNIFORM TRADE SECRETS ACT § 3 cmt., 14 U.L.A. 589 (2005 main volume).

Unless one concludes that neither Ballard nor anyone else would have developed an extended use endotracheal catheter in the two decades between the 1998 New York lunch

and 2018, Russo's calculation of damages until 2018 and the award based on that calculation were excessive. Russo presented no evidence that his idea would have enjoyed 20 years of market exclusivity. Yet, the district court erroneously denied Ballard's request to instruct the jury that the "head start" period could even be considered in determining the appropriate period for which Russo was entitled to damages. Aplt.App. 2112.

Moreover, because Russo's "secret" was not patented and could be easily and lawfully copied once a product embodying it was on the market, any "head start" provided by a misappropriation would necessarily be short-lived. To the extent that the Trach Care 72 has a 17-year advantage in the market, that is only a result of the exclusivity provided by Ballard's patents, not the "secrecy" of any idea taken from Russo or the "head start" any such idea provided. Absent Ballard's patents, any Ballard competitor could copy Russo's supposed invention and siphon off much of the "profit" that Russo seeks to recover.

For all these reasons, an award of all or substantially all of Ballard's Trach Care 72 profits for the life of Ballard's patents is clearly excessive.

### E. In Any Event, the Award of Unjust Enrichment Was Both Speculative and Overbroad.

Russo's supposed invention was, as noted above, an improvement to an existing, patent-laden device that already had achieved not only commercial success but market dominance. Yet, as noted above, the court refused Ballard's motion to limit damages to those attributable to the invention in question, Aplt.App. 338-39, and refused to give instructions, proffered by Ballard, that would have guided the jury in apportioning damages. *Id.* 506-08, 2111-13. As a result, for all the reasons noted at pp. 63-64, above, a significant component of the verdict awarded Russo consisted of profits attributable to product characteristics for which Russo can claim no credit.

Moreover, because Ballard's Trach Care line already had captured 85% or more of the market, sales of the Trach Care 72 must come primarily at the expense of Trach Care 24

sales—it performs the same function, but for a longer approved period of time. Because Trach Care 72 will necessarily "cannibalize" sales of Trach Care 24, focusing on Trach Care 72 profits overstates the economic benefit to Ballard.

Russo's expert, Hoffman, acknowledged that this "cannibalization" will occur, but chose to ignore it because he was unable to measure it. Aplt.App. 1698-700, 1730, 1744. But Hoffman claimed to be confident predicting Trach Care 72 sales twelve years into the future; why could he not have done so with Trach Care 24? Ballard's expert did so, *id.* 2296-303, albeit to predictable criticism from Russo. *Id.* 2330-34. If Hoffman did not like Ballard's approach, he could have used a different one. But, whatever method Hoffman might favor to account for cannibalization, he had to choose *something*. *See, e.g., Norris v. Baxter Healthcare Corp.*, 397 F.3d 878, 885 (10th Cir. 2005) (expert must not only "rule in" alleged cause but must "rule out" others); *Atlantic Richfield Co. v. Farm Credit Bank*, 226 F.3d 1138, 1167-68 (10th Cir. 2000) (expert failed to establish basis for disregarding inconsistent data). Instead,

Hoffman did nothing. Without any reduction for cannibalization, the verdict was by definition excessive in this respect as well.

### F. Although a Reasonable Royalty Would Have Been an Appropriate Remedy, Russo Did Not Establish a Competent Basis for One.

The only contract damages Russo can plausibly claim are the profits he would have received but for Ballard's breach, *i.e.*, the royalties he would have received had Ballard paid him for a license. Although a reasonable royalty would be an appropriate measure of damages (assuming Russo established liability), no evidence supports the jury's conclusion that such a royalty would be $3 million.

Russo's expert valued such a license at only $2.751 million. But even this calculation is fatally flawed. The proper method for measuring a reasonable royalty is to "calculate what the parties would have agreed to as a fair price for licensing the defendant to put the trade secret to the use the defendant intended at the time the misappropriation took place." *Univ. Computing Co.*, 504 F.2d at 539. This is an objective inquiry, which must take into account a variety of

factors.  *See ibid.*; *Vermont Microsystems, Inc. v. Autodesk, Inc.*, 88 F.3d 142, 151 (2d Cir. 1996).

Russo did not come close to satisfying such an objective inquiry.  His expert, Hoffman, testified to a royalty damages figure and explained the arithmetic that produced it, but expressly disclaimed any opinion concerning the reasonableness of the key component of his computation—*i.e.*, the royalty rate itself.  Aplt.App. 1704, 1707-08, 1712.  He could hardly have done otherwise; in denying Ballard's pre-trial motion to strike Hoffman's testimony, the district court "preclude[d] [Hoffman] from addressing whether that rate is reasonable," leaving Russo to "establish the propriety of the royalty rate through the introduction of other evidence." *Id.* 313 (Tab 5 at 32).  At trial, however, Russo produced no such evidence.  To the contrary, Russo testified that he expected further negotiation, *see* Aplt.App. 1228 ("I felt that sooner or later [Ballard] would come back to me"), and acknowledged having licensed other ideas to Ballard for a fraction of what he demanded in 1998.  *Id.* 1118-23.

Thus, in presenting a royalty damages figure, Hoffman served as nothing more than a human calculator, applying the rate his client had demanded without any attempt to establish its objective reasonableness.  The rate his client had demanded, moreover, was for a license to all the technology he disclosed pursuant to the CDA, including the three patents which Ballard never used.  Neither Hoffman nor Russo ever tried to adjust that demand to account for the narrower scope of technology actually at issue.

In the absence of any showing that Russo's demand reflected what similarly-situated parties would have agreed to for the trade secret at issue, it was error to allow the question of contract damages even to go to the jury.  *Vermont Microsystems*, 88 F.3d at 151-52 (error to base reasonable royalty solely on what plaintiff demanded to license its trade secret).  The court compounded that error by refusing to instruct the jury either on the objective standard for determining a reasonable royalty or that it could consider "the price that has been paid in the past for the use of similar trade secrets."  *See* Aplt.App. 506-08, 2111-12.

## CONCLUSION

For all of the foregoing reasons, the judgment should be reversed. Alternatively, the judgment should be vacated and the cause remanded for a new trial under the appropriate standard of proof and with proper limitations on the amount of damages.

## CERTIFICATE OF COMPLIANCE WITH RULE 32(a)(7)(B)

In accordance with Rule 32(a)(7)(C) of the Federal Rules of Appellate Procedure, undersigned counsel hereby certifies that this brief complies with the type-volume limitations set forth in Rule 32(a)(7)(B), and that this brief, exclusive of the items listed in Rule 32(a)(7)(B)(iii), contains 13,017 words.

## STATEMENT CONCERNING ORAL ARGUMENT

Ballard requests that the Court hear oral argument. This case raises significant issues relating to the interplay between patent law and state trade secret law which, as noted above, may have jurisdictional implications. In addition, the appropriate measure of damages is an issue of sufficient complexity that Ballard anticipates the Court will benefit from oral argument.

Dated this 20th day of August, 2007.

Respectfully submitted,

**s/Michael B. Apfeld**
Michael B. Apfeld
GODFREY & KAHN, S.C.
780 North Water Street
Milwaukee, WI  53202-3590
Phone: 414-273-3500
mbapfeld@gklaw.com

Constantine L. Trela, Jr.
SIDLEY AUSTIN, LLP
One South Dearborn
Chicago, IL  60603
Phone: 312-853-7293
ctrela@sidley.com

Marcy G. Glenn
HOLLAND & HART, LLP
555 17th Street, Ste. 3200
Denver, CO  80202
Phone: 303-295-8000
mglenn@hollandhart.com

*Attorneys for Appellant-Cross-Appellee, Ballard Medical Products*

## CERTIFICATE OF SERVICE

I, Brenda S. Sweeney, certify that on August 20, 2007, I served two paper copies of the **Opening Brief of Defendant-Appellant Ballard Medical Products (including required Addendum)** via Federal Express Next Day Courier, and one copy by digital submission as a native PDF (with attachments in scanned PDF) to the following at the land and email addresses listed below:

> Richard D. Burbidge
> Jefferson W. Gross
> Burbidge Mitchell & Gross
> Parkside Tower, Suite 920
> 215 South State Street
> Salt Lake City, UT  84111
> rburbidge@bmgtrial.com

**s/Brenda S. Sweeney**

## CERTIFICATION OF DIGITAL SUBMISSIONS

The undersigned certifies that all required privacy redactions have been made and, with the exception of those redactions, every document submitted in digital form or scanned PDF format is an exact copy of the written document filed with the clerk.  Additionally, the digital submission has been scanned for viruses with the most recent version of a commercial virus-scanning program, Symantec Antivirus Client 10.1.5.5, updated daily, and according to the program is free of viruses.

**s/Brenda S. Sweeney**

mw1345046_1